**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| RICHARD F. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22 CV 52 DDN |
| | ) | |
| CORIZON INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>OPINION, MEMORANDUM AND ORDER</u>**

Self-represented Plaintiff Richard F. Brown brings this action under 42 U.S.C. § 1983, alleging deliberately indifferent medical and dental care in violation of the Eighth Amendment. The matter is now before the Court upon the motion of Plaintiff for leave to proceed *in forma pauperis*, or without prepayment of the required filing fees and costs.  ECF No. 14.  Having reviewed the motion and the financial information submitted in support, the Court will grant the motion and waive the filing fee in this matter.  *See* 28 U.S.C. § 1915(a)(1).  Furthermore, after reviewing the complaint, the Court will partially dismiss the complaint under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted.  However, the Court will direct the Clerk of Court to issue process or cause process to be issued against defendant Dr. Joule Stevenson, in her individual capacity only, and against defendant Corizon.  Furthermore, as there is no constitutional right to appointment of counsel in civil cases and it would be premature to grant appointment at this stage in the proceeding, the Court will deny Plaintiff's motion for counsel, subject to refiling at a later date.

**Motion to Proceed *In Forma Pauperis***

Plaintiff was a prisoner on August 18, 2022, when he initiated this action.  On September 28, 2022, the Court granted Plaintiff's first Motion to Proceed *In Forma Pauperis* (ECF No. 2)

and directed him to pay an initial partial filing fee from his prison account.  However, in a letter dated October 26, 2022, Plaintiff informed the Court that he had been released from prison.  *See* ECF No. 12.  Because the financial information before the Court was no longer an accurate representation of Plaintiff's financial situation, the Court directed him to file a new Motion to Proceed *In Forma Pauperis* with accompanying financial affidavit.  *See* ECF No. 13 at 2.  Plaintiff filed that motion on November 29, 2022, indicating that he is unemployed and owns no valuable assets.  ECF No. 14.  As such, the Court will grant Plaintiff's new Motion to Proceed *In Forma Pauperis* (ECF No. 14) and waive the filing fee in this matter.

## Legal Standard on Initial Review

Under 28 U.S.C. § 1915(e)(2), the Court may dismiss a complaint filed *in forma pauperis* if the action is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief.  When reviewing a complaint filed by a self-represented person under 28 U.S.C. § 1915, the Court accepts the well-pleaded facts as true, *White v. Clark*, 750 F.2d 721, 722 (8th Cir. 1984), and it liberally construes the complaint.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the plaintiff's complaint in a way that permits the claim to be considered within the proper legal framework.  *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015).  However, even self-represented plaintiffs are required to allege facts which, if true, state a claim for relief as a matter of law.  *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980); *see also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (refusing to supply additional facts or to construct a legal theory for the self-represented plaintiff).

To state a claim for relief, a complaint must plead more than "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory

statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Id.* at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

### The Complaint

Plaintiff is a recently released Missouri Department of Corrections ("MDOC") prisoner, who was confined at Northeast Correctional Center ("NECC") in Bowling Green, Missouri.  ECF Nos. 1 at 1, 12 at 1.  He brings this action under 42 U.S.C. § 1983, alleging violations of his civil rights against eleven defendants associated with providing medical and dental care at NECC: (1) Corizon Inc.; (2) Centurion Inc.[1]; (3) Dr. Joule Stevenson (Plaintiff's physician and former Medical Director); (4) Regina Gonia (Health Services Administrator); (5) Pasha Allen (Director of Nurses); (6) Diane Wade (nurse); (7) Cathy Griffin (nurse); (8) Dr. Ernest Jackson (Missouri Director of Dental Services); (9) Jewel Cofield (Constituent Services grievance officer); (10) Dr. Thomas Bredeman (Regional Medical Director); and (11) Dr. John Spears (contract spinal surgeon).  ECF No. 1 at 1-2.  Plaintiff names all defendants in their individual and official capacities. *Id.* at 2.

### A. Allegations Regarding Medical Care

Prior to arriving at NECC, Plaintiff had a history of degenerative discs dating back to 2005; he had multiple spinal fusions in 2008 and 2012; and he had a total left hip replacement in 2015.

---

[1] On November 15, 2021, 'Centurion Health' replaced 'Corizon Health, Inc.' as the medical services company contracted with MDOC to provide statewide correctional healthcare – including medical and mental health services for incarcerated people at nineteen (19) correctional facilities and two (2) community transition centers across the state of Missouri.

*Id.* at 3.  Despite this history, Plaintiff reports that he "walked and felt perfect" before his transfer to NECC in December 2018.  *Id.*  Plaintiff's complaint is a diary-like listing by date of his medical and dental issues from December 2018 until August 2022.  *Id.* at 3-13.  The allegations against each specific defendant are a little difficult to decipher because Plaintiff details actions taken by many NECC employees who are not named defendants,[2] and he intertwines his medical and dental complaints together.

As best as the Court can decipher, Plaintiff's medical complaints started in June 2019 when he began having "strange[] nerve sensations" and feeling that his walking gait "was not quite right."  *Id.* at 3.  He states that he started "seeking medical help" in the summer of 2019, but he does not name how he sought help or who he sought it from.  At the end of August 2019, a non-defendant nurse practitioner ordered x-rays of Plaintiff's spine, which were done in early September.  According to Plaintiff, the x-rays showed "significant lumbar deterioration."  At the end of October, Plaintiff reported more difficulty walking and pain "radiating in his lower back and hip" and he requested a hip x-ray.  *Id.*; *see also* ECF No. 1-1 at 1-7.  Plaintiff saw defendant Dr. Stevenson in mid-November regarding his pain and difficulty with walking and sleeping.  Dr. Stevenson "raised his [C]ymbalta[3] dosage," but she denied his request for an MRI, stating that his symptoms did not warrant it.  ECF No. 1 at 3.  Plaintiff saw Dr. Stevenson again in early February

---

[2] For example, Plaintiff discusses actions taken by dentists Drs. Spence, Stovall, and Moeller; nurse practitioner Tamara Crouch; and other unknown actors, including Karma, Sgt. Adams, Hillary, Sgt. Rubio, nurse Johnna, Sgt. Welch, Renee Oakley, Olivia, Melanie, and Callie.  ECF No. 1 at 3-13.  None of these persons are named defendants in this action.

[3] The Court assumes Plaintiff was prescribed Cymbalta "to help relieve nerve pain" associated with his "ongoing … chronic back pain."  *Cymbalta – Uses, Side Effects, and More*, https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited Dec. 13, 2022).  It can also help improve sleep.  *Id.*

2020 regarding his pain and "mobility awkwardness." *Id.* at 4.  Dr. Stevenson "raised [Plaintiff's] [G]abapentin[4]" and ordered a hip x-ray, but she again denied his request for an MRI.

In mid-February 2020, Plaintiff felt a "pop" in his lower back that resulted in immediate and excruciating pain.  *Id.*  After no response to the emergency call button in his cell all night long,[5] Plaintiff "self declared" to a non-defendant correctional officer in the morning.  However, no one ever came to get him for sick call and on the following day, Plaintiff was told he needed to go up medical himself but he "was too sick."  He was then denied the use of a wheelchair by an unnamed nurse, but Plaintiff states that he was using another inmate's chair.  Four days after the "pop," Plaintiff made it to sick call but he was refused a wheelchair since he did not have a doctor "layin for one."  However, a nurse gave Plaintiff a chair two days later.  About thirteen (13) days after the "pop," at the end of February, Plaintiff saw Dr. Stevenson.  Plaintiff complained of "incontinence, pain, [and his] leg giving out when [he tried] to stand."  Dr. Stevenson gave him a wheelchair and reported that his x-ray results were "normal."  *Id.*  However, based on exhibits attached to the complaint, it appears that Plaintiff's hip x-rays in February 2020, had results "outside of acceptable limits."  ECF No. 1-1 at 26-27.

In mid-March, Plaintiff again requested an MRI and a medication adjustment while at sick call.  ECF No. 1 at 4.  He saw Dr. Stevenson at the end of March.  *Id.* at 5.  According to Plaintiff, Dr. Stevenson reported that "all they would do was treat and deal with symptoms and not the cause because of the expense."  When Plaintiff expressed his concern about becoming permanently disabled, Dr. Stevenson responded that "she was not sure she could prevent that."  Dr. Stevenson denied Plaintiff's request for specific medications that Plaintiff had taken in the past and she told

---

[4] Again, the Court assumes that Plaintiff was taking Gabapentin for its use "to relieve nerve pain."  *Gabapentin – Uses, Side Effects, and More*, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Dec. 13, 2022).

[5] The Court notes that according to the affidavit signed by Plaintiff's cellmate at this time, Austin Fisher, Plaintiff did not hit the "Help Button" in the cell until around 5 am, after suffering for "7-8 hours."  ECF No. 7 at 7.  A non-defendant correctional officer responded to the button push.  *Id.*

Plaintiff to put in a request for an MRI at sick call and then she would put in a referral, but she cautioned him that "it would not be approved."  In early April, Dr. Stevenson informed Plaintiff that the MRI request had been denied.  Plaintiff states that "physical therapy exercises" were recommended instead; however, Dr. Stevenson later denied that recommendation was made.  *Id.*

At the end of April, Plaintiff went to sick call complaining of difficulty standing; pain, numb spots, burning and tingling in his legs; incontinence causing accidents multiple times a week; sleeping difficulties; strength and dexterity problems in his right hand; spasms and cramps in his back, legs, and inner thighs; and his toes involuntarily curling and cramping.  *Id.*; *see also* ECF No. 1-1 at 8-14.  Plaintiff saw Dr. Stevenson twice in May but on the first visit "she would only deal with blood press[ure]."  However, at the end of May, Dr. Stevenson "added" Robaxin and Ultram to Plaintiff's prescribed medications.  At this visit, Plaintiff complained about "losing control of [his] legs and bowels almost daily."  ECF No. 1 at 5.

Starting in late May through November 2020, Plaintiff reports that he fell many times while trying to stand and walk.  *Id.* at 5-10.  In June, Plaintiff sent a letter to the Health Services Administrator, defendant Regina Gonia, and to Director of Nurses, defendant Pasha Allen, "asking for help."  *Id.* at 6.  Plaintiff saw Dr. Stevenson multiple times in June.  Plaintiff states that Dr. Stevenson refused to give him anything for his incontinence and refused to increase his pain medications to three times per day, but she did refer him to a neurosurgeon.  However, once the neurosurgeon referral was denied, Dr. Stevenson "supposedly suggested a referral for MRI."  When Plaintiff requested more pain medication again, Dr. Stevenson stated that she wanted to see the results of the MRI.  *Id.*

During this same time period, Plaintiff states that he was also fighting for a wheelchair and incontinence products.  *Id.* at 6-7.  According to Plaintiff, in June 2020, Dr. Stevenson did not renew Plaintiff's wheelchair "layin" but instead allowed him use of a cane.  *Id.* at 6.  Plaintiff states

that he "BEGGED her to give [him] something for the incontinence like Depends" or protection pads, because Plaintiff reported having accidents three times a day.  Plaintiff states that Dr. Stevenson "refused" but "finally conceded to putting in [a] request for Depends."  *Id.*  According to one of Plaintiff's attached exhibits, in July 2020, Plaintiff had medical lay-ins for "one pack of depends per month, a wheelchair, no high places or use of ladders, and a bottom bunk."  ECF No. 1-1 at 11.  However, it appears he was not receiving the depends frequently enough or on-schedule, because he had to write "two kites" and a "HSR" in an attempt to get more.  *Id.* at 38.

In late June, Plaintiff fell and dislocated his hip.  ECF No. 1 at 7; *see also* ECF No. 1-1 at 19.  Dr. Stevenson was called and she ordered an x-ray[6] for the following weekday.  Three days later, Plaintiff was taken to a non-prisoner medical center to have his "hip [put] back into socket."  According to Plaintiff, the nurses and doctors at the private medical center "said they would have expected NECC to bring [him] in the same day as the dislocation."  They also said that they normally would do a "reduction" procedure in the emergency room but since the dislocation was so bad, it had to be done in the operating room under sedation.  When Plaintiff returned to NECC the same day, defendant Regina Gonia "interrogat[ed]" him about the letter that he sent her.  Gonia advised Plaintiff that she would "continue Stevenson's treatment plan."  ECF No. 1 at 7.

In early July, Plaintiff had a follow-up appointment with Dr. Stevenson regarding the hip reduction.  Dr. Stevenson would not address Plaintiff's concerns about his back and his MRI referral, but instead she advised Plaintiff to put in a health services request.  *Id.*  About a week later, Plaintiff had a telemedicine visit with the private doctor who performed his reduction.  *Id.* at 8.  That non-defendant doctor reported that Plaintiff's x-rays looked good and he recommended that Plaintiff see a spinal specialist immediately about his back.  The doctor suggested defendant

---

[6] According to a medical x-ray report filed by Plaintiff, he had a left hip x-ray "2 days post fall" that showed a "dislocation of [his] left total hip prosthesis."  ECF No. 4-1 at 14.

Dr. Spears, who apparently Plaintiff had seen in the past.  Soon after that appointment, Plaintiff had an MRI of his spine and on the following day, he saw Dr. Stevenson.  She refused to give Plaintiff the specific medications in specific dosages that he requested, stating that she wanted to see the MRI results before making any decisions.  But she did put in the referral to Dr. Spears.

At the end of July, Plaintiff met with Dr. Stevenson regarding the MRI results.  According to Dr. Stevenson, the results "indicated there was no reason why [Plaintiff] should be experiencing the symptoms" that he had and that "there was no reason [Plaintiff] should be having the problems" that he was reporting.  Dr. Stevenson did note mild stenosis at "L3-5" but that "nothing on the report indicated that [Plaintiff's] hardware was not in the correct spots."  Plaintiff continued to describe his pain as "burning, stabbing, shooting pains in [his] legs and groin."  Dr. Stevenson responded that "there wasn't much more to do."  *Id.*

In early August, Plaintiff saw "spinal surgeon" Dr. Spears.  *Id.* at 9.  He recommended a "decompression at L1-L2" due to spondylolisthesis in that area.  When questioned, Dr. Spears suggested that Plaintiff may not have developed his current symptoms if he had been treated earlier.  Dr. Spears advised Plaintiff to discontinue his ibuprofen and blood thinners in preparation for the surgery.  Plaintiff met with Dr. Stevenson soon after this to discuss Dr. Spears' recommendation.  Dr. Stevenson said she would put in the referral for surgery but she would not prescribe a replacement for the discontinued ibuprofen.  *See also* ECF No. 1-1 at 14.  From late August through early December, Plaintiff had to frequently report to medical to have the dressing changed on a hip pressure wound which he developed from spending so much time in a wheelchair.  ECF No. 1 at 9-11.

Two months after it was recommended, in early October, Plaintiff had the spinal decompression surgery.  *Id.* at 10.  In a follow-up telemedicine visit with a non-defendant doctor a few weeks later, Plaintiff reported that he was still in "quite a bit of pain" but that he could walk

some with a cane and behind a wheelchair.  The doctor cautioned that Plaintiff's "nerves might now be damaged permanently" and that it is possible that earlier treatment might have had different results.

On November 30, 2020, Plaintiff fell in his prison wing when he lost his balance taking out the trash.  *Id.*  He was unable to walk after the fall and his leg was swollen and bruised.  On the following day, Plaintiff went to sick call about his leg and was informed that he was already scheduled to see the doctor soon.  Four days after the fall, Plaintiff had a visit with Dr. Stevenson regarding pain medicine.  According to Plaintiff, Dr. Stevenson "wouldn't look at [his leg] or examine it," but she did say she would order an x-ray.  After multiple trips to sick call in an attempt to get that x-ray, Plaintiff finally had an x-ray of his left hip ten (10) days after the fall.  *Id.*  Plaintiff had broken his femur in multiple places where the "rod" (presumably from his hip replacement surgery) "was forced down into the bone."  *Id.* at 10-11.  In mid-December, Dr. Stevenson referred Plaintiff for an orthopedic consult regarding his leg.  Plaintiff saw a non-defendant orthopedic doctor in mid-January 2021.  *Id.* at 11.  That doctor advised Plaintiff "to try to use [a] walker at 50% weight" and opined that if the rod doesn't move, Plaintiff would be fine and no new hip would be necessary.  A few weeks later, Plaintiff met with a non-defendant medical employee at NECC for a "wheelchair wellness check."  When Plaintiff explained the conservative approach suggested by the orthopedic doctor, the NECC employee told Plaintiff that "Corizon makes it SO hard on the doctors to actually DO anything."

About seven (7) months following the leg break, in early July 2021, Plaintiff saw Dr. Stevenson about pain and neuropathy in his bottom and private parts.  *Id.*  Later in July, Plaintiff had a six-month follow-up with the orthopedic doctor who found Plaintiff's leg to be "stable."  *Id.* at 12. At Plaintiff's request, the doctor measured Plaintiff for a lift and recommended orthopedic shoes for stability.  Plaintiff reports that at this time he was in "the most horrible pain."  He was

having difficulty sleeping, it was painful to urinate, and his skin was very sensitive to water and clothing.  Plaintiff also complains that his three (3) requests for physical therapy, made both before and after his spinal surgery, were all denied by Dr. Stevenson.  Her stated reason for denial was that such therapy had not been recommended by a specialist.  Plaintiff states that his leg muscles had atrophied due to not walking "in almost a year" and without physical therapy, it caused him to "walk with a pronounced limp and an unbalanced, uneven gait."

At the end of 2021,[7] Plaintiff met with a non-defendant doctor about his labs, back history, and bowel problems.  The doctor suggested that Plaintiff may have permanent nerve damage and that his bowel issues may persist.  *Id.*  In March and April 2022, Plaintiff filed grievances about a "L5-S1 herniated disc that has needed repair since [he] had back surgery in 2020" and his neuropathy.  *Id.* at 13.  In May, Plaintiff met with a non-defendant doctor about abdomen/bowel x-rays, but it is unclear what the results were.  In June, Plaintiff requested an x-ray and MRI of his back, reporting "miserable pain," "more difficulty walking," and "burning in [his] legs, thighs, back, butt, [and] crotch."  Apparently, Plaintiff did receive a new wheelchair and compression hose at this time.  In August, Plaintiff saw a non-defendant doctor for a prostate exam, socks, and x-ray of L5-S1.  Plaintiff reports that the vertebrae were "very out of alignment," that there was "[n]o disc left around [the] spinal canal," and that there was a "3/4" gap in between vertebra." Plaintiff initiated this lawsuit soon after.

Plaintiff attached years of prison grievance filings with his complaint.  ECF No. 1-1.  He began complaining about Dr. Stevenson, inadequate pain medications, and the need for further testing for diagnosis in October 2019.  *Id.* at 1.  It appears he filed approximately nine (9) informal resolution requests between October 2019 and May 2022, complaining about his medical care.  *Id.*

---

[7] The Court notes that by this time period of alleged complaints, Centurion had taken over for Corizon as the MDOC inmate healthcare provider.

at 1-59.  Furthermore, in support of Plaintiff's medical claims, he filed affidavits from other prisoners who either lived with him or lived in his prison wing.  ECF Nos. 7, 10.[8]  In these affidavits, the fellow prisoners attest to witnessing Plaintiff's pain, difficulty walking, use of a wheelchair, need for assistance, multiple falls, and problems with incontinence.  *Id.*

### B.  Allegations Regarding Dental Care

Plaintiff names only one individual defendant related to dental care – Dr. Ernest Jackson – who Plaintiff describes as the Missouri Director of Dental Services and the person responsible for providing and coordinating offender dental services at NECC.  *Id.* at 2.  Plaintiff complains about a delay in receiving dentures and other routine dental care.

Sometime in the summer of 2019, Plaintiff began "trying to get dental treatment for his upper partial impression," which was a problem originally noted at his prior place of incarceration. *Id.* at 3.  He says that he went to sick call in October 2019, but he does not specify his complaint or the response.  In January 2020, Plaintiff saw a new dentist at NECC (not a named defendant), who recommended the "same treatment plan."  Plaintiff does not specify what that treatment plan was.  *Id.*  According to grievance filings, Plaintiff complained of a delay in dental care that caused "blisters, open sores, pain, [and] an inability to eat properly."  ECF No. 1 at 65.

In March 2020, Plaintiff saw a different non-defendant dentist who "took impressions" and stated that they would be back in two (2) to three (3) weeks.  ECF No. 1 at 4.  In June, Plaintiff "[w]ent to sick call re partials.  Into the 21st month now."  *Id.* at 6.  The unnamed nurse at sick call refused to refer him to dental because she said they "weren't doing filing or extractions yet."  *Id.* A few days later, Plaintiff was informed that "Dr. Jackson supposedly made a decision statewide

---

[8] Plaintiff's requests to submit these affidavits in support of his claims will be considered requests for the Court to consider the documents as exhibits to the complaint.  *See* ECF Nos. 7 at 1 & 10 at 1.  Based on the Federal Rules, the Court will treat these attachments as part of the pleadings.  *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes").

that any non extraction would not be done due to COVID." *Id.* at 7.  At the end of August, Plaintiff

wrote a letter to Dr. Jackson "re getting partials done." *Id.* at 9.  In November, Plaintiff saw a non-

defendant dentist regarding pulling broken teeth and he decided to "pull the remaining uppers and

do [a] full plate." *Id.* at 10.  In December, the same dentist removed Plaintiff's left-side, top teeth.

*Id.* at 11.

In January 2021, Plaintiff had another two teeth pulled.  The dentist indicated at that

appointment that it could take weeks or months to "get the impression" because "they were behind"

and "lab problems."  The following month Plaintiff went to sick call concerning a gum infection

and found out that the NECC dentist had quit.  *Id.*  According to grievance filings, it appears

Plaintiff did see a dental provider for first impressions in April 2021.  ECF No. 1-1 at 77-79.

However, in December 2021, Plaintiff filed another grievance about gum infection and denture

delay because he had been put in for the same treatment plan four times.  *Id.* at 82-83; ECF No. 1

at 12.  His grievance was denied the following month as duplicative.  *Id.*

At the end of February 2022, Dr. Jackson did the "bite for final denture" and told Plaintiff

that he would expedite his dentures since he had been waiting so long.  *Id.* at 13.  In April when

Plaintiff still had not received his dentures, he self-declared and the dentures were located.

However, when Plaintiff went to get them two days later, a non-defendant dentist thought Plaintiff

needed a wax impression.  Plaintiff received his dentures in June 2022.

For relief on both his medical and dental claims, Plaintiff seeks declaratory judgment and

compensatory damages from all defendants.  *Id.* at 16.

## Discussion

It is well established that the government has an obligation to provide medical and dental

care to those whom it is punishing by incarceration.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

To demonstrate constitutionally inadequate medical or dental care, the inmate must show that a

prison official's conduct amounted to deliberate indifference.  *Dulany v. Carnahan*, 132 F.3d 1237-38 (8th Cir. 1997).

Plaintiff alleges a documented history of back and hip problems when he was transferred to NECC in December 2018.  Over the subsequent four years, Plaintiff's health problems progressively worsened while he experienced continuous and increasing pain; difficulty walking and standing; and incontinence.  His condition deteriorated to the point where he had to use a wheelchair and he fell multiple times, suffering injuries.  He alleges a delay in the diagnosis of his medical conditions and in the treatment of the pain those conditions caused.  Also, when transferred to NECC in 2018, Plaintiff had already completed his first impressions for dentures yet he did not actually receive dentures until June 2022.

Accepting Plaintiff's allegations as true, the Court finds that Plaintiff has plead sufficient facts to state a claim of deliberate indifference against defendant Dr. Joule Stevenson and Corizon. Dr. Stevenson was Plaintiff's primary physician over the time period at issue.  Plaintiff claims that Dr. Stevenson was aware of his medical needs but that she did not take the appropriate steps to diagnose and treat them in a timely manner, resulting in long-term, detrimental side effects for Plaintiff.  Plaintiff also asserts that Corizon's custom or policy of doing the minimal tests and treatment as necessary, in order to save money, resulted in pain, delayed medical diagnosis, and physical damage.  These allegations are sufficient to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B).  The Court will direct the Clerk of Court to issue process on Plaintiff's complaint against defendants Dr. Joule Stevenson, in her individual capacity, and Corizon.

On the other hand, Plaintiff's claims of deliberate indifference against defendants Centurion, Regina Gonia, Pasha Allen, Diane Wade, Cathy Griffin, Dr. Ernest Jackson, Jewel Cofield, Dr. Thomas Bredeman, and Dr. John Spears are not sufficiently plead to state a claim of deliberate indifference.  As discussed below, these defendants will be dismissed.

### A.  Dental Claims against Dr. Jackson

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which was designed to provide a "broad remedy for violations of federally protected civil rights."  *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 685 (1978).   One such federally protected right is the Eighth Amendment's prohibition on cruel and unusual punishment, which protects prisoners from deliberate indifference to serious medical needs.  *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).  To prevail on a deliberate indifference claim, a prisoner plaintiff must demonstrate that he suffered from an objectively serious medical need, and that defendants actually knew of and disregarded that need. *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019); *Dulany*, 132 F.3d at 1239.  A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quoted case omitted).

"[D]eliberate indifference requires a highly culpable state of mind approaching actual intent."  *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (quoted case omitted).  An inmate must demonstrate that a prison health care provider's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care."  *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014) (quoted case omitted).  Allegations of mere negligence in giving or failing to supply medical treatment will not suffice.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Nor will a prisoner's "mere disagreement with treatment decisions" support a claim of deliberate indifference.  *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008).

Deliberate indifference may also be demonstrated by prison officials who intentionally deny or delay access to medical care.  *Estelle*, 429 U.S. at 104-05.  When a delay in treatment is alleged to have violated an inmate's constitutional rights, a court measures the objective severity

of the deprivation "by reference to the *effect* of the delay in treatment." *Jackson v. Riebold*, 815 F.3d 1114, 1119 (8th Cir. 2016) (internal quotation marks omitted) (quoting *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)).  To support a claim based on a delay in treatment, a plaintiff must present "verifying medical evidence" showing that the delay in treatment had detrimental effects. *Id.* at 1119-20*; see also Holden*, 663 F.3d at 342 ("[a] prisoner alleging a delay in treatment must present verifying medical evidence that . . . [the] delays adversely affected his prognosis.").

In this case, based on Plaintiff's statements, it wasn't until February of 2022 that Plaintiff saw defendant Dr. Jackson for dental care.  At that time, Dr. Jackson ordered Plaintiff's dentures and told Plaintiff he would expedite them due to prior delays.  Later, a different dentist determined Plaintiff need one additional impression, but Plaintiff did receive his dentures in June 2022.  The majority of Plaintiff's dental care at NECC was provided by dentists not named as defendants.

Plaintiff describes Dr. Jackson as the Missouri Director of Dental Services.  However, "[a] supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (*citing Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)).  "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990).  To be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985).

To the extent that Plaintiff alleges that Dr. Jackson is the person responsible for deciding that dental services would be limited in June 2020 due to COVID, this decision does not support Plaintiff's allegation of a delay in dental services since Plaintiff admits to seeing a dentist in November and December 2020 and again in January 2021.  Plaintiff also states that he wrote Dr.

Jackson a letter in August 2020 about his need for partials.  However, Plaintiff did not actually see Dr. Jackson for dental services until February 2022, and he received his dentures four months later.

Plaintiff's allegations are insufficient to state a claim of deliberate indifference against Dr. Jackson.   Nothing  in  Plaintiff's  allegations  suggests  intentional  maltreatment  or  criminal recklessness by Dr. Jackson.  Plaintiff received his dentures four months after first seeing Dr. Jackson.  This does not constitute deliberate indifference.  *See Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) ("Many cases finding deliberate indifference due to a delay in dental care involve almost a complete lack of treatment leading to an infection or worsening condition."). Defendant Dr. Jackson will be dismissed from this action for failure to state a claim against him.

### B.  Medical Claims Against Individual Defendants

#### a.  Dr. Joule Stevenson

Dr. Stevenson was Plaintiff's primary treating physician while he was incarcerated at NECC.  Dr. Stevenson had knowledge of Plaintiff's history of back and hip problems.  Plaintiff complained to her for years about increased problems walking and standing, continuous pain, and incontinence.  Plaintiff fell multiple times, resulting in a dislocated hip and broken leg.  Despite Plaintiff's surgical history and complaints, Dr. Stevenson denied requests for further testing and changes to the pain treatment plan.  Dr. Stevenson admitted that she would only treat and deal with symptoms and not the cause of Plaintiff's pain, because of the expense.  Dr. Stevenson chose to treat Plaintiff's medical problems with less expensive medical procedures and to delay treatment at times to save money.  Plaintiff alleges that Dr. Stevenson was personally involved in his medical care, and directly responsible for the fact that Plaintiff now appears to have permanent nerve damage and bowel problems.  Plaintiff has alleged sufficient facts to state a claim for deliberate indifference to his serious medical need against defendant Dr. Stevenson pursuant to § 1915(e)(2)(B).

In this case, Plaintiff names Dr. Stevenson in both her individual and official capacities. Dr. Stevenson's employer during the relevant time period, Corizon, has also been named as a defendant and as discussed below, process will also issue against Corizon. Plaintiff's official capacity claims against Dr. Stevenson are redundant of his claims against Corizon itself. *See King v. City of Crestwood, Mo.*, 899 F.3d 643, 650 (8th Cir. 2018) ("[A]s a suit against a government official in his official capacity is functionally equivalent to a suit against the employing governmental entity, a suit against a government official in only his official capacity should be dismissed as redundant if the employing entity is also named."). Therefore, process shall issue against Dr. Stevenson on the complaint in her individual capacity only.

### b. Regina Gonia, Pasha Allen, Diane Wade, Cathy Griffin, Jewel Cofield, and Dr. Thomas Bredeman

Plaintiff asserts that defendants Jewel Cofield, Dr. Thomas Bredeman, Regina Gonia, Pasha Allen, Cathy Griffin, and Diane[9] Wade "did at all times relevant show deliberate indifference to plaintiff's serious medical needs … in that they were all purportedly in positions of authority but failed to investigate, respond to, and reasonably attempt to resolve matters around inmate medical needs and where grievances were involved." ECF No. 1 at 15. As such, Plaintiff does not assert that these defendants were personally involved in his medical care decisions, but that they should have recognized that his medical care needs were not being adequately addressed when they responded to his grievances and complaints.

To be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights. *Martin*, 780 F.2d at 1338. However, a plaintiff may, under a theory of direct liability,

---

[9] Plaintiff actually refers to this defendant as "Dawn Wade" but the Court construes this a typo. *See* ECF No. 1 at 15.

maintain a civil rights claim against a prison official whose failure to train, supervise, direct, or control actions of a subordinate is such that it constitutes deliberate indifference to plaintiff's serious medical needs. *Moyers v. Buescher*, 806 F.Supp. 218, 220 (E.D. Mo. 1992). "[A] supervisor's liability arises if: 'he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.'" *Tlamka*, 244 F.3d at 635 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citations omitted)); *see also Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).

Plaintiff does not allege that any of these defendants directly participated in his medical care decisions.  The fact that Plaintiff sent some of these defendants a letter in June 2020 complaining about his medical care is not enough to show personal involvement.  *See* ECF No. 1-1 at 93-95.  Plaintiff also does not assert that any of them were responsible for supervising and training Dr. Stevenson – the doctor who provided most of Plaintiff's medical care at NECC. Plaintiff cannot state a § 1983 claim against these defendants based on their handling of grievances alone.  *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (a prison officials' failure to process or investigate grievances, without more, is not actionable under § 1983; grievance procedure is procedural right only and does not confer substantive right on inmate).  As such, the Court finds that Plaintiff's complaint fails to state a § 1983 claim against defendants Regina Gonia, Pasha Allen, Diane Wade, Cathy Griffin, Jewel Cofield, and Dr. Thomas Bredeman.  These defendants will be dismissed.

### c. **Dr. John Spears**

Plaintiff states no specific legal claims against Dr. Spears.  Regardless, as he is not a state actor, he is not subject to suit under 42 U.S.C. § 1983.  The essential elements of a constitutional claim under § 1983 are that the defendant acted under color of state law, and that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right.  *Schmidt v.*

*City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009).  To that end, only state actors can be held liable under § 1983.  *Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir. 2008); *see also Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975 (8th Cir. 1993) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974)) (stating that § 1983 secures constitutional rights from government infringement, not infringement by private parties).

Dr. Spears is described by Plaintiff as a contract spinal surgeon.  Plaintiff was referred to Dr. Spears by Corizon and Centurion medical employees for consultation and surgery.  Dr. Spears is a doctor in private practice and therefore a private party.  Furthermore, Plaintiff states in his complaint that Dr. Spears "is a party to this solely for the purposes of discovery and medical testimony" and Plaintiff states no claims against him in the 'Legal Claims' section of his complaint. ECF No. 1 at 2 & 14-16.  As such, it appears that Plaintiff is not actually alleging any claims of deliberate indifference against Dr. Spears.  Because a party should not be named as a defendant for purposes of discovery and because Dr. Spears is not a state actor, he will be dismissed as a defendant in this § 1983 action.  Plaintiff fails to state a § 1983 claim against Dr. Spears.

## C.  Claims against Contracted Medical Providers: Corizon and Centurion

Plaintiff names Corizon and Centurion as defendants in the caption of his § 1983 complaint but he states no specific claims against them in the 'Legal Claims' section of his complaint.  ECF No. 1 at 1, 14-16.  In the complaint's 'Facts of the Case,' Plaintiff discusses a conversation he had with a non-defendant NECC medical employee about his broken leg.  *See* ECF No. 1 at 11.  When Plaintiff explained that he was waiting six weeks to follow-up with the orthopedic specialist to see if his prosthesis moved, the NECC employee "said that Corizon makes it SO hard on the doctors to actually DO anything" and she said that a doctor recommending the "smallest" surgical option is an example of "how Corizon operates."  *Id.*; *see also* ECF No. 4-1 at 19 (where specialist recommends the "smallest surgery" that can be performed).  In an additional filing, Plaintiff alleges

that "based on information, [Plaintiff] believes that Corizon's policies also attributed to the delay [in receipt of medical and dental care,] according to staff statements."  ECF No. 4 at 1.

"A corporation acting under color of state law cannot be liable on a respondeat superior theory."  *Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007).  Rather, to support a claim against such a corporation, the plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006); *see also Stearns v. Inmate Services Corp.*, 957 F.3d 902, 906 (8th Cir. 2020) (explaining that the "proper test" for determining whether a corporation acting under color of state law is liable under 42 U.S.C. § 1983 "is whether there is a policy, custom, or action by those who represent … official policy that inflicts injury actionable under § 1983").

Liberally construing Plaintiff's allegations here, Plaintiff complains that Corizon has a policy or custom that requires doing the minimal treatment possible, that delays and denies necessary diagnostic tests like MRIs, that treats symptoms instead of overall problems due to expense, and that results in extensive delays in the receipt of necessary dental care.  Plaintiff asserts that this Corizon policy or custom of cost-savings measures has delayed and/or denied him access to adequate medical and dental care.  According to Plaintiff, he would not currently have the medical problems that he has, if Corizon had not delayed medical care.  Also, Plaintiff alleges many years of delays in receipt of dental care that resulted in pain and suffering.  *See, e.g.*, *Dadd v. Anoka Cnty.*, 827 F.3d 749, 755 (8th Cir. 2016) ("Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature.").  The Court finds that Plaintiff has stated a sufficient claim under the Eighth Amendment to survive initial review under 28 U.S.C. § 1915(e)(2) against Corizon.  Plaintiff has adequately plead that Corizon's deliberate indifference, by an intentional delay in or

- 20 -

denial of access to medical and dental care, has detrimentally affected his health.  As a result, the Court will order that process be issued against Corizon on the complaint.

Centurion replaced Corizon as the provider of healthcare for MDOC inmates in mid-November 2021.  There was approximately nine months from when Centurion took over and Plaintiff filed this lawsuit.  In that period, Plaintiff saw multiple health care providers, he requested and received x-rays of his back, he got a new wheelchair and compression hose, he had a prostate exam, and he finally received his dentures.  Plaintiff does not make any allegations of a constitutional violation resulting from a policy, custom, or action of Centurion.  Therefore, the Court will dismiss Plaintiff's claims brought against defendant Centurion for failure to state a claim upon which relief may be granted.

## Appointment of Counsel

Finally, Plaintiff has filed a motion for appointment of counsel.  ECF No. 4.  The appointment of counsel for an indigent plaintiff in a civil matter lies within the discretion of the Court.  *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006).  There is no constitutional or statutory right to appointed counsel in civil cases.  *Nelson v. Redfield Lithograph Printing*, 728 F.2d 1003, 1004 (8th Cir. 1984).  Once the plaintiff has alleged a *prima facie* claim, the Court must determine the plaintiff's need for counsel to effectively litigate his claim.  *In re Lane*, 801 F.2d 1040, 1043 (8th Cir. 1986).  The standard for appointment of counsel in a civil case is whether both the plaintiff and the Court would benefit from the assistance of counsel.  *Edgington v. Mo. Dep't of Corr.*, 52 F.3d 777, 780 (8th Cir. 1995), *abrogated on other grounds by Doe v. Cassel*, 403 F.3d 986, 989 (8th Cir. 2005).   This determination involves the consideration of several relevant criteria, including "the factual complexity of the issues, the ability of the indigent person to investigate the facts, the existence of conflicting testimony, the ability of the indigent person to

present the claims, and the complexity of the legal arguments." *Phillips*, 437 F.3d at 794 (citing *Edgington*, 52 F.3d at 780).

In this matter, the Court finds that appointment of counsel is not warranted at this time. The action appears to involve straightforward questions of fact rather than complex questions of law. Further, the request for counsel is premature, as defendants have not yet been served, and the Court has not issued any Case Management Order. The Court concludes that the appointment of counsel would not be of sufficient benefit to the Court or to Plaintiff at this time, and will deny Plaintiff's motion for appointment of counsel, without prejudice.

**Conclusion**

Plaintiff's motion to proceed *in forma pauperis* will be granted and the filing fee will be waived. Because Plaintiff's complaint states sufficient factual allegations to state a claim of deliberate indifference against defendant Dr. Joule Stevenson, process shall issue against this defendant in her individual capacity only. In addition, Plaintiff states a sufficient custom or policy claim for process to issue against defendant Corizon. However, as to all other defendants, Plaintiff fails to state a § 1983 claim under 28 U.S.C. § 1915(e)(2)(B). Defendants Centurion, Regina Gonia, Pasha Allen, Diane Wade, Cathy Griffin, Dr. Ernest Jackson, Jewel Cofield, Dr. Thomas Bredeman, and Dr. John Spears will be dismissed. Finally, Plaintiff's motion for appointment of counsel will be dismissed without prejudice to refiling at a later date.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for leave to proceed *in forma pauperis* [ECF No. 14] is **GRANTED** and the filing fee is waived. *See* 28 U.S.C. § 1915(a)(1).

**IT IS FURTHER ORDERED** that the Clerk shall **not** issue process or cause process to issue upon the complaint as to defendants Centurion Inc., Regina Gonia, Pasha Allen, Diane Wade, Cathy Griffin, Dr. Ernest Jackson, Jewel Cofield, Dr. Thomas Bredeman, and Dr. John Spears

because, as to these defendants, the complaint fails to state a claim upon which relief can be granted under 28 U.S.C. § 1915(e)(2)(B).  Plaintiff's claims against defendants Centurion Inc., Regina Gonia, Pasha Allen, Diane Wade, Cathy Griffin, Dr. Ernest Jackson, Jewel Cofield, Dr. Thomas Bredeman, and Dr. John Spears are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to defendant Dr. Joule Stevenson, **in her individual capacity only**, as to Plaintiff's claims of deliberately indifferent medical care.  This defendant should be served pursuant to the service agreement the Court maintains with Corizon.

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the complaint as to defendant Corizon, as to Plaintiff's claims of deliberately indifferent medical and dental care.  This defendant should be served pursuant to the service agreement the Court maintains with Corizon.

**IT IS FURTHER ORDERED** that the Clerk shall **not** issue process or cause process to issue upon the complaint as to defendant Dr. Joule Stevenson **in her official capacity** because these claims are redundant and shall be dismissed under 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that Plaintiff's motion for appointment of counsel [ECF No. 4] is **DENIED without prejudice**.

An Order of Partial Dismissal will accompany this Opinion, Memorandum and Order.

Dated this 10th day of January, 2023.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE